## GEORGE D. LAY *vs.* LEWIS EMERY, JR.

Opinion filed July 1, 1899.

### Partnership Settlement—Conclusiveness.

Partners who have made a settlement of their accounts, in whole or in part, and reduced it to writing, are concluded thereby, and the courts will not disregard it, when it is free from fraud, duress, misrepresentation or concealment, or mistake of fact.

### Good Faith Between Partners.

The partnership relation requires the highest good faith between partners, and will not permit one partner to gain any advantage over his co-partner by the slightest misrepresentation or concealment.

**Partners Trustees for Each Other.**

Partners are trustees for each other, and as such one partner may not use partnership property for his own profit, and, if he does, may be required to account for the profit made, or value of its use.

**Evidence to Avoid Partnership Settlement.**

A member of a partnership who seeks to avoid a partnership settlement, and to secure a full accounting, must not only show facts which would authorize a court of equity to disregard the settlement, but also produce evidence of such a character that an accounting can be made. In the absence of such evidence, the balance found in the settlement will not be disturbed except as to items which are shown to be erroneous.

**Equity of Partnership Accounting.**

In an action for an accounting between partners, where it appears that one of the partners contracted to devote his entire time to the management of the partnership business, and that he has retained from the firm funds compensation for his entire time, when in fact he devoted only a portion of it, a court of equity, upon a final adjustment of the partnership accounts, may make deduction for the value of the portion of his time not so employed.

Appeal from District Court, Grand Forks County; *Templeton, J.*

Suit by George D. Lay against Lewis Emery, Jr. Judgment for plaintiff. Defendant appeals.

Modified.

*Bosard & Bosard, (Cochrane & Corliss,* of counsel) for appellant.

Under the contract between the parties, Lay had exclusive management of the business, Emery being engaged with large interests in the East, was unable to give any personal attention to the farm. Lay bound himself by contract to keep accurate accounts and to make yearly reports, he to have $1,200 as compensation for his services, to be considered and accounted for as part of the operating expense of the farm, all profits, in each year, up to $6,000 were to be paid to the defendant; profits in excess of $6,000 to be equally divided. The trial court found that this contract created a partnership. *Galveston Ry. Co.* v. *Davis, 23* S. W. Rep. 301. The plaintiff contracted to give his entire time to the farm, but the uncontradicted proofs show that for five years he did not give it to exceed one-half his time. One-half of the salary collected by him should be restored. A court of equity will decree such compensation in form, kind or amount as shall be needed to make good any losses arising from violation of partnership duties. Parsons on Partnership, 223. Where the managing partner keeps the books so imperfectly and badly that the true state of accounts and transactions of the firm can not be ascertained from them, every presumption should be applied against the person in fault. *Dimond* v. *Henderson, 2* N. W. Rep. 73; 2 Lindley on Partnership, 808; *Van Ness* v. *Van Ness, 32* N. J. Eq. 669; *Harvey* v. *Varney,* 104 Mass. 436, 444; Story on Partnership (6th Ed.) § 181; *Gray* v. *Haig,* 20 Beav. 219; 1 Story, Eq. Jur. § 468; *Walmsley* v. *Walmsley,* 3 Jones & Lat. 556; *Kelley*

v. *Greenleaf,* 14 Fed. Cas. 238; *Pomeroy* v. *Benton,* 57 Mo. 531, 546; *Kirwan* v. *Henry,* 16 S. W. Rep. 828; *White* v. *Lady Lincoln,* 8 Ves. 363, 15 Ves. 441. The plaintiff covenanted to conduct the farm in a good and husbandlike manner, using his best skill and judgment at all times. In violation of his contract he permitted it to grow to mustard, damaging the land, under the evidence, to the amount of $5,000. This damage is chargeable to plaintiff. *Carlin* v. *Donegan,* 15 Kan. 495; Parsons on Partnership, 223; 2 Lindley on Partnership, 783; *Murphy* v. *Croft,* 71 Am. Dec. 519; Story on Partnership, § 173; *Haller* v. *Owiez,* 23 Ark. 566; *Yorks* v. *Fozer,* 60 N. W. Rep. 846; *Lefer* v. *Underwood,* 41 Pa. St. 505. The plaintiff during the period he managed this farm deposited firm moneys in different banks with his personal deposits, blending all of such deposits together in one account, and checked therefrom indiscriminately for firm and personal uses—even his wife drawing checks against this common account. Plaintiff admits his inability to determine how much of these deposits were from the farm and how much were individual, or what sums were drawn out of this common account for his own use and for the use of the partnership, respectively. In such case the whole deposit should be treated in equity as belonging to the partnership, so far as it is incapable of being distinguished. 1 Story, Eq. Jur. § § 623, 468; *Pomeroy* v. *Benton,* 57 Mo. 545; *Kelley* v. *Greenleaf,* 14 Fed. Cas. 238; *Hart* v. *Ten Eyck,* 2 Johns. Ch. 62 & 108, and note at end of case; *Brackenridge* v. *Holland,* 20 Am. Dec. 128; *Jewett* v. *Dinger,* 30 N. J. Eq. 308; *Brakley* v. *Tuttle,* 3 W. Va. 126; *Railroad Co.* v. *Hutchins,* 37 Ohio St. 298; *Kreuger* v. *Cooney,* 45 Md. 592; *Weatherby* v. *Green,* 22 Mich. 318; *Moore* v. *Bowman,* 47 N. H. 501; *Diversey* v. *Johnson,* 93 Ill. 547, 569. This rule holding the party accountable for the entire mass, except in so far as he can clearly show what is his own property, is applied in all cases where a trust relation exists. The relation between copartners is fiduciary. 1 Beach on Trusts, § 91; Parsons on Partnership, § 231; 16 Am. & Eng. Enc. Law, 1054; *Pomeroy* v. *Benton,* 57 Mo. 538; *Brooks* v. *Martin,* 2 Wall 70; *Kelley* v. *Greenleaf,* 14 Fed. Cas. 238. It was error to permit the plaintiff in an action to settle partnership accounts to recover for tort against the defendant for the conversion of plaintiff's grain. *Bates* v. *Lane,* 28 N. W. Rep. 753.

*Burke Corbet,* for respondent, filed a printed argument without citation of cases.

YOUNG, J. This is an action for an accounting between partners. It comes to us for trial anew upon defendant's appeal from a judgment rendered against him in the court below. The case calls for a final adjustment of accounts, arising out of the operation by them of a large wheat farm, and covering a period of five years. In the latter part of 1889 the defendant, Emery, who was then the owner of a tract of farming land situated in Grand Forks county, consisting of about 3,250 acres, which was fully equipped with horses,

mules, cattle, machinery, feed, and provisions, including seed grain, necessary for its operation, entered into a contract with the plaintiff, Lay, relative thereto, the material parts of which are as follows: "This agreement, made and entered into this twenty-third day of December, A. D. 1889, by and between Lewis Emery, Jr., of Bradford, in the State of Pennsylvania, party of the first part, and George D. Lay, of Grand Forks, in the State of North Dakota, party of the second part, witnesseth: That the said party of the first part, for and in consideration of one dollar, the receipt whereof is hereby acknowledged, and for the further covenants and agreements hereinafter mentioned to be performed by the party of the second part, does lease and farm let unto the said second party the following described lands [omitting description]. Also all of the equipments to the foregoing premises, including horses, mules, cattle, hogs, turkeys, chickens, farm implements, house-furnishing goods, provisions, and feed, as are now upon said premises; all of which property is shown by an inventory hereto attached. * * * This said lease is to commence on the first day of January, A. D. 1890, and continue for the period of three years, and end on the 31st day of December, A. D. 1892. In consideration of the said leasing the said party of the second part agrees to give his entire time to the management and operation of said farm, and to conduct the same in a good and husbandmanlike manner, using his best skill and judgment at all times; to keep correct books of accounts of all receipts and disbursements, and all transactions regarding the management of the said farm; to keep a correct and complete list of all increase and decrease in live stock, and at the end of each year make a correct and complete report of his doings during the past year. * * * That said books of account shall be open to inspection at all times to the said party of the first part, his agent or attorney. * * * That the said party of the second part is to have full management, control, and operation of said farm, and all business transactions are to be carried on in his name, and he is to be wholly responsible for the full management of the same. * * * That there shall be allowed the sum of twelve hundred dollars as salary for the said party of the second part, as his compensation as superintendent of the said farm, and the same shall be reckoned as a part of the operating expense of the same. That, after all expenses are paid for the operating of said farm, then the said party of the first part shall draw and be paid the sum of six thousand dollars ($6,000.00) from the profits of said business. Then, if there shall be a balance of profits in the hands of the said party of the second part, the same shall be divided in equal portions, and each of the parties hereto shall take one-half. Then, at the expiration of this lease, the said premises shall be left in the same condition as when entered upon. That there shall be as many acres of ground plowed at the expiration as are now plowed. That there shall be an equal number of stock of all kinds left upon the said premises to be equal in value and condition. There shall be an equal amount of feed and grain left upon

the said premises, including hay, straw, or millet; also an equal amount of provision and fuel. In all cases natural wear and tear and destruction by the elements are excepted. At the expiration of this lease, should there be a greater number of stock of any kind or class, or a greater amount of provisions or feed for stock, or grain of any kind, or any article or thing or lands than is now upon said farm, the same shall be divided in equal portions, each of the parties hereto taking one-half. * * * Should there be at any time any expenses growing out of the running of said premises, and there should be no funds from the products to pay the same, then each of said parties hereto shall pay one-half, and each shall be given credit for the same." At the expiration of the three-year period this contract was extended by written indorsement thereon for two years more,—that is, until January 1, 1895,—without change, except that the salary of Lay was increased to $2,200 per year, and he, in consideration of such increase, relinquished an option, which he had secured in the original contract, for the purchase of one-half of the entire farming plant at a fixed price for such half of $50,000, divided into several annual payments at 6 per cent. interest. This is contained in the portion of the contract which we have omitted. Both parties have treated the contract as one of partnership, and it is so treated by them in this Court. By its terms the defendant parted with the possession and use of his farming plant for a term of five years. The title thereto, however, remained in him. The object of the partnership was to operate the farm for the mutual profit of the parties. In addition to having a share in prospective profits, the plaintiff was to receive a fixed salary as compensation for his services as manager of the business.

The farm was operated under this contract for the full period without disagreement of any nature between the parties. Neither during this entire time does there appear to have been any difference of opinion between them as to the meaning of its terms, or as to the rights which each had under it. The entire controversy arose upon the final settlement. From the time the contract was entered into, up to and after the date of its expiration, the defendant, Emery, who resided at Bradford, Pa., was not within the state, and did not see the property. Neither did he have any information concerning it and their business other than that received from the plaintiff, Lay, who was in exclusive control. Such information as he had was gained entirely from the letters and reports of Lay, and from conversations with the latter at Bradford, the defendant's home, which plaintiff seems to have visited annually, and sometimes at defendant's request, for the purpose of discussing the business of the partnership. It clearly appears that at all times the defendant had implicit confidence in Lay, and fully relied upon his reports and statements concerning their affairs. On December 13, 1894, just before the five years was up, Lay wrote to the defendant at Bradford, calling his attention to the fact that the lease was about to expire, and expressed a desire to close their matters up promptly.

He also stated that it would be necessary to have some one upon the ground to act for him, and asked if he could not come himself during the winter, and added, "I have paid all expenses for the year just past, and everything is in good shape for another year." On December 22d the defendant answered this letter, stating that he could not come, and requested the plaintiff to take a perfect inventory of the entire farm, and to come to Bradford, bringing a complete statement of everything, prepared to close the business up, or to make further arrangements for the future. In compliance with this letter the plaintiff went to Bradford, where several days were spent by them in adjusting their affairs. Finally, and on February 12, 1895, upon the statements and representation made by Lay as to the condition of their accounts, and upon the inventory showing the property then remaining on hand on the farm, a settlement was made, and reduced to writing. This settlement embraced two features: First. A separate and final settlement of all other matters than the adjustment of the excess and deficiencies of different kinds of property, which had to be determined by a comparison with inventory of property on hand when he took charge five years before. In this portion of the settlement the defendant, Emery, was charged with $3,431.04 as his half of alleged deficiencies for two years' business, being in all $6,862.07, made up from an alleged shortage of $1,026.20 for 1892 and $5,835.87 for 1893. He was also charged with the sum of $423.15 interest on the foregoing sum, to compensate Lay for the use of the money for the period for which he claimed to have advanced it. The rate charged was 12 per cent. for nine months and 10 per. cent. for four months. Defendant was also charged with $1,552.20 for an assignment made to him at that time of Lay's one-half interest in a certain school-land contract which had been paid for by partnership funds; also $252.67 to Lay as interest on the last sum. In addition, defendant took from plaintiff, at what was said to be cost price, an engine and feeder, for which he was charged $1,060. He was credited with a general balance of account of $221.13, then in plaintiff's hands from outside matters, and $2,000 for a draft remitted by him to Lay, August 9, 1894. For the balance remaining against him upon this settlement defendant gave Lay his four notes, due at different dates, amounting in all to $4,600.93. These notes have been paid. After completing this portion of the settlement, they compared the schedule of 1890, which showed the amount in kind and value of all property originally placed in plaintiff's charge, with the inventory which the plaintiff had brought with him at defendant's request. From this comparison a schedule in writing was made, showing in detail the number, kind, and amount of each class of property in excess or less than that received in 1890, the time when the partnership was formed. This schedule bears the heading, "Memorandum of Settlement between Lewis Emery, Jr., and George D. Lay, made February 12, 1895," followed by this statement: "Under the terms of the contract, the following surplus and under-

plus items were determined and remain open for adjustment and division." Then follows a list of surplus items consisting of 18 horses, 18 mules, 10 Holstein cattle, 8 common cattle, 156 chickens, and 6,400 pounds of salt pork; the underplus items being 4 hogs and 3,850 pounds of binding twine. The excess of wheat was found to be 4,400 bushels, which was to be disposed of as follows: "From this overplus of 4,400 bushels of wheat there is to be sold sufficient to pay the deficiency for 1894, after which the remainder belongs to Mr. Emery." After this settlement was concluded, Lay returned to Grand Forks county, and continued at least in nominal control of the property pending the coming of Emery to complete the settlement of the surplus items then on hand. In March thereafter Emery took charge of the property in person, and in so doing he also took possession of a quantity of wheat, consisting of 1,129 bushels, which was plaintiff's separate property, produced on another farm, but stored by him in the Emery elevator, along with the partnership grain. He also got possession of a certain horse, which Lay claimed as his own. Almost immediately after assuming control of the property, Emery's attention was called to several discrepancies in Lay's reports of his stewardship, which aroused his suspicions as to their accuracy and integrity. In reading over the accounts to a Mr. Miller and his wife, who lived on the farm, and together had been in the employ of the partnership for several years at an annual salary, he learned that the amount of their wages was reported $28 in excess of that actually allowed, and it was further discovered that they had not in fact been paid for almost three years' wages, and that on November 20, 1894, they had accepted Lay's duebill for $1,785.59 for the balance due for that time, although in his reports for each of these years he had charged the farm with their full salary. Other instances of real or supposed delinquencies were developed, which induced defendant, Emery, to refuse to proceed with the division of the remaining property, or to surrender any portion of it. In October thereafter, Lay instituted this action for an accounting. His complaint, which consists of 22 separate paragraphs, sets out various items upon which he claims the right to recover judgment against the defendant for the aggregate sum of $8,855. For instance, he demands $1,000 for legal services rendered in collecting certain rents for him from other property during this time; $2,202.98 for deficiencies in receipts over disbursements for the years 1892, 1893, and 1894; also certain sums for improvements made, machinery bought, and taxes paid; also for one-half interest in the schoolland contract, which has been referred to; also numerous other items, which need not be mentioned further than to say that they include all the items listed by him for further division and adjustment in the schedule made at Bradford on February 12, 1895. The complaint, however, entirely ignores the settlement made at Bradford.

The defendant answered, alleging, among other things, that he

had no personal knowledge concerning their affairs; "that all his means of information as to the amounts produced on said farms, and expenses thereof, and of any of the items of said business, were obtained .from annual reports and statements made by the plaintiff to the defendant at Bradford, Pa., and, trusting and relying upon the integrity of this plaintiff, and his reports and accounts, the same was permitted to run for the period of five years"; and avers "that this plaintiff did use and appropriate to his own use large amounts of wheat and produce of said farm, and did purchase for his own individual use, and not for the use of said farm, large amounts of merchandise out of the common fund, and did squander and dissipate the property of this defendant; that the plaintiff did not keep accurate accounts of his transactions, and did not make entries upon said books, or account to this defendant for property taken from said farm, and moneys used from the proceeds thereof, and in his own private transactions, and did not keep accurate account of his transactions in the course of said business, as required by said contract, and did carelessly and negligently permit said property to become impaired in value, and did divert large sums of money for the uses and purposes expressed in the contract between the parties hereto, and diverted from the defendant; and that by careless, negligent, and fraudulent transactions on the part of the plaintiff, this defendant has suffered loss to an amount exceeding fourteen thousand dollars in the properties of this partnership, diverted and unaccounted for, and otherwise as will hereinafter more particularly appear." It is also alleged that the receipts were greater than reported, and expenses less; also that the plaintiff used "the horses, men, seed grain, and farm implements of this defendant in plowing, seeding, and working his own private farms, and that the seed grain used by him on such farms was not accounted for, and that the hired help, and the board, the teams, and board thereof, the machinery, and their rental value, have never been accounted for or reported to this defendant," all of the value of $2,000; further, that plaintiff appropriated to his own use during these years, provisions, grain, etc., of the value of $2,100. And, particularizing, defendant further alleges: "That in the year 1892 the plaintiff sold to the North Dakota Milling Company wheat from the farm aforesaid to the value of $7,209.99, no part of which has been accounted for to this defendant. That he also sold to N. G. Larimore property of the value of $900, and to other parties seed wheat to the value of $1,082.25, or a total of $9,092.24, in the year 1892, over and above that accounted for, and that said sum was entirely unaccounted for to this defendant; and this defendant avers upon information and belief that with said moneys so fraudulently appropriated this plaintiff purchased $9,000 of stock in the Merchants' National Bank of Grand Forks, North Dakota, and $1,000 of stock in the Farmers' Bank of Emerado, and that all moneys which went into such stock, or a large proportion thereof, were moneys diverted from and misappropriated by plaintiff from said farm. That plain-

tiff is now the owner of said stock, or a large proportion thereof, purchased with the moneys of this defendant, or of said partnership, and unaccounted for." The total loss resulting from the various sources enumerated in the answer is estimated therein at $14,000. Both plaintiff and defendant pray for a full accounting. Upon the evidence submitted the trial judge found: "That on the 12th day of February, A. D. 1895, the plaintiff and defendant had a full and complete settlement of all matters arising out of the contract hereinbefore mentioned, and the operation of the business connected therewith, excepting the division of the wheat, provisions, and live stock on the premises January 1, 1895, owned jointly in excess of the amount of like property owned by defendant on the premises January 1, 1890, and except taxes of 1894; and said settlement included all legal and other services rendered by plaintiff to defendant." The court adopted the settlement so found to have been made, and merely adjusted the items in controversy which were not fully concluded by it by allowing the plaintiff $763.67 as his interest in the surplus wheat necessary to repay him for one-half of the deficiency for 1894, $125 for the horse claimed by him, $690 for wheat belonging to him personally, $1,527.40 for his one-half interest in the excess of live stock; making a total of $3,106.07. From this was deducted $404.25, the value of the deficient property, and $477.32, being one-half of the 1894 taxes, leaving a balance due plaintiff of $2,224.50, for which judgment was ordered and entered.

Upon this appeal there is presented for review a mass of evidence, a portion of which is contained in a printed abstract larger than the Revised Codes, and the remainder is presented in the form of original exhibits, consisting of accounts, checks, reports, receipts, and bank books, etc., which, if printed, would make several volumes more of an equal size. These original exhibits, through the courteous stipulation of counsel, we are permitted to explore the same as though embodied in the printed record. A careful examination of all of the evidence contained in the record relating to the settlement found by the trial court satisfies us that the settlement was made as found, and that finding is therefore adopted as the finding of this Court. That it was made does not admit of doubt. The only parties present when it occurred were Mr. Emery and his secretary, Mr. Jones, and plaintiff, Lay. It is supported by the direct evidence of the two first named, and is denied by plaintiff, Lay, only in part. The written memoranda in which the settlement was embodied are not impeached in any way, and are conclusive. If this were all, and the adjustment by the trial court of the items above mentioned is correct,—and we think it is,—we would merely affirm the judgment, for it is an accepted rule that where partners conclude a settlement of their affairs, and reduce it to writing, without fraud, duress, misrepresentation, or concealment, or mistake of fact, and dealing at arm's length, they are concluded by their act, and it will not be disregarded by the courts. See *Little* v. *Little, 2* N. D.

175, 49 N. W. Rep. 736. The same doctrine applies to a partial settlement. In *Stretch* v. *Talmadge*, 65 Cal. 510, 4 Pac. Rep. 513, it is said that: "It is undoubtedly generally true that in an action to dissolve a partnership, and for a settlement of its affairs the account must be taken from the beginning to the end of the partnership. But, if there has been a partial settlement between the partners themselves, that fact may be proved in the action (*Clark* v. *Gridley*, 41 Cal. 119), and, if proved, the settlement will be considered valid between the partners themselves, unless it is assailed on the ground of mistake, error, or fraud. Story, Partn. 349. If there is no valid objection to the settlement, it is conclusive upon the parties so far as it goes, and leaves open only the unsettled portions of the account." In this case the plaintiff neither alleges, nor does the testimony disclose, any facts which would, as to him, serve as ground for opening the settlement entered into. On the contrary, it was based wholly upon information which he himself furnished, and as to matters concerning which he had exclusive and entire knowledge. On his part he acted knowingly; and if it here appeared that his reports were accurate, and his disclosure of the facts was complete, so that the defendant was placed upon an equal footing with him, the settlement would be binding upon both. But such is not the case. Without going into detail here, it is sufficient to say that the evidence fully establishes conditions which authorize a court of equity, at defendant's request, to disregard the settlement made, and require a complete examination of the partnership accounts during the entire period of its existence. The partnership relation requires the highest good faith between the partners, and will not permit one partner to gain any advantage over his co-partner by the slighest misrepresentation or concealment. Their relation is confidential, and they are trustees for each other, and as such one may not use the partnership property for his own profit, and, if he does, he may be required to account for the profit made, or pay the value of its use, at the option of the injured partner. This general doctrine of the courts is embodied in the legislative enactments of this state. See section 4265, 4273, 4379, 4380, 4391, 4393, Rev. Codes. The case of *Pomeroy* v. *Benton*, 57 Mo. 531, is somewhat similar to the case at bar. One of the partners lived in New York, the other at St. Louis, where he had charge of the portion of their business done at that point. The action was to recover profits made by the latter out of private speculations with partnership funds. The Court said: "The relations of trust and confidence existing between the plaintiff and himself placed him under an equitable obligation to communicate all he knew of the matter then pending to the plaintiff, to 'make a clean breast of it,' to disclose to him all the material facts within his knowledge touching the negotiation then in progress as fully as though he had stepped upon the witness stand and kissed the book; and nothing short of a complete disclosure of this sort could exonerate the defendant from the charge of undue concealment, which, under circumstances like

the present. is, in the sense of a court of equity, itself a fraud. * * * The doctrine here asserted—that confidence reposed and the fullest disclosures are, in equity, correlative terms—is one in full accord with the authorities above mentioned, and must commend itself to the cordial approval of every just mind, while it rebukes the manifestation of that spirit which, looking to its own advantage, is too prone to diregard the rights of those to whom it owes the fealty incident to intimate and confidential association." The case at bar is one peculiarly requiring the exercise of the highest degree of good faith on the part of the plaintiff. The defendant had not only intrusted to him the personal custody and management of a large amount of property, and of great value, but had given into his charge the entire duty of attending to the finances of the partnership. The only value which plaintiff brought to the partnership was such personal service as he rendered in connection with the duties he had specifically agreed in the contract to perform, which may be epitomized as follows: First, to give his entire time to the management and operation of the farm, and to give to it his best skill and judgment; second, to keep correct books of accounts of all receipts and disbursements and all transactions regarding the management of the farm, and, in addition, to keep a record of the increase and decrease of stock, and report yearly. The defendant not only asserts that plaintiff has acted in bad faith, but has actually appropriated partnership money and property to his own use, and has used partnership money and property for his private gain, and, in addition, has charged the partnership for expenses in some cases in greater amounts than in fact was paid. It is not possible to go into all the items in detail, or discuss them at length, in this opinion. Our discussion must necessarily be limited to the most important matters. Defendant contends that the plaintiff has failed to account for over 20,000 bushels of wheat grown upon this farm between January 1, 1890, and January 1, 1895. This shortage is based upon a comparison of the number of bushels shown to have been placed in the Emery elevator on the farm with the number of bushels accounted for by the plaintiff in his reports as sold or used for seed. A discrepancy of about that amount exists upon the basis of such a comparison. The bulk of the wheat, however, which defendant contends has not been accounted for is clearly shown to be a portion of the crop of 1891, not sold in that year, but carried over, and sold in 1892, and is now a known quantity. The crop of 1891 was unusually large, and good prices were realized. Plaintiff's report made at the close of that year shows that he had sold only a portion of the grain, giving the number of bushels, and reported that from the sum realized he had paid all expenses of that year, paid his 1891 salary, paid Emery his $6,000, and to himself and Emery each the sum of $1,500 profits, and further showed a balance of cash on hand of $12.48. In addition, there was reported on hand after sale, after taking out seed, 13,000 bushels of wheat by estimate; also a large quantity of oats,

barley, and other produce.  No written report of the sale or dis-
position of this remaining grain was ever made by Lay.  The real
amount of wheat is now shown to have been about 14,000 bushels,
and that it was sold in 1892 by Mr. Lay.  Further reference to this
will be made later.  The evidence as to the remaining portion of
the alleged shortage of wheat is of such a character that we are
unable to predicate upon it a conclusion that plaintiff appropri-
ated any part of it to his own use.  The actual amount used for seed
each year is not definitely known; neither is the dockage upon the
amount sold.  It also appears that a portion of the wheat included
in defendant's estimated shortage was the individual wheat of plain-
tiff placed in the Emery elevator, but grown upon other land.
Our attention will therefore be directed exclusively to the above
unreported wheat of 1891, disposed of in 1892.  Plaintiff's written
reports are entirely blank as to receipts and disbursements from
January 1, 1892, up to October 17, 1892.  Since defendant assumed
control of his property, it has been disclosed, and stands admitted
in this record by plaintiff, that during this period he received and
had the following moneys of the partnership, and from the sources
named :

| | | |
|---|---:|---:|
| Balance from 1891.. .. .. .. .. .. ..'.. .. .. .. .. .. ..  $ | 12 | 48 |
| Northern Milling Co. (10,520 bushels wheat).. .. .. .. .. | 7,209 | 99 |
| N. G. Larimore 2,553 bushels wheat.. .. .. .. .. .. .. .. | 1,900 | 00 |
| Wheat sold after seeding, 928 bushels .. .. .. .. .. .. .. | 668 | 16 |
| Elevator rent .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. | 1,000 | 00 |
| Colts killed on railroad.. .. .. .. .. .. .. .. .. .. .. .. | 900 | 00 |
| All other sources .. .. .. .. .. .. .. .. .. .. .. .. .. .. | 200 | 00 |

    Total.. .. .. .. .. .. .. .. .. .. .. .. .. .. $11,890  63

    Out of this he paid to Mr. Emery, in June, 1892, the sum of
$2,000 on a further division of profits, and was entitled to a like
amount himself, leaving a net balance to be still accounted for of
$7,890.63 during this limited period.  Plaintiff's explanation is that
he expended all of this money in paying farm expenses, and all
prior to October 17, 1892, except the sum of $608.26, which he
fixes as the balance on hand belonging to the farm at the last named
date.  It appears that the plaintiff, although residing with his family
in Grand Forks, had an office in the house on the farm, where all
his books, papers, and vouchers concerning farm matters were kept.
This house was destroyed by fire on October 17, 1892, and with it
plaintiff's papers.  This accounts for the confusion in this year,
and is relied upon by plaintiff as a reason for not reporting in detail
the receipts and disbursements for this period.  The fact of the
fire was reported to Emery, who was also informed of the con-
fusion caused in the farm accounts by reason of the loss of the
vouchers, and of the practical difficulty in preparing any account
of their affairs which would be more than an estimate.  Some time
after the fire,—in November or December, which is not clear,—

plaintiff went to Bradford, where he spent several days. He then stated to Mr. Emery that the records were destroyed, and that he could not show the condition of affairs prior to the time of the fire, except that he had in the bank at that time $608.26 that belonged to the farm. It also appears that it was agreed that Lay should start his books at that date, with this estimated balance of $608.26 due the farm. It is also clear that Lay reported that all expenses were paid up to the time of the fire. There were present at Bradford at these conversations Mr. Emery, Mr. Jones, and plaintiff. Jones says: "There was no settlement of the past time made; it was simply a rendering of a statement to Mr. Emery, and accepted by Mr. Emery, because there was no other thing to do." Emery testifies that Lay never made a report of the disposition of the surplus wheat, and that it was not mentioned; that "he (Lay) said, as near as he could tell all there was due to the farm was the bank account of six hundred and some odd dollars, and we struck a balance on that basis after the fire"; and that no figures were given to him as a basis for that conclusion. Lay does not testify that he detailed to Emery the items of receipts which are now shown to have been received by him from the 1891 business, but presumes he did mention them generally. We are satisfied that no detailed statement was made, but that the balance struck of $608.26 was based entirely upon Lay's statement that that sum was the actual balance due the farm at the time of the fire, as near as he could determine. The items of receipts and disbursements were not given, even from memory. The amount was one arbitrarily fixed by Lay, and accepted by Emery as correct. A very careful examination of the evidence on this point has convinced us that this balance was not correct, and did not represent the amount then due the farm by at least $2,700. This conclusion is based largely upon the plaintiff's evidence, and his own computation made at that time upon a small slip of paper, which somehow was preserved by being retained in his bank book, and was produced therefrom at the trial, and offered in evidence by the defendant. Lay testifies that he made the figures upon it, and further said: "I estimated that I had that much cash on hand, $608.26. That is the identical paper that the figures were made on in their office, and it is the basis upon which the settlement was made, and Mr. Emery consented to it. I have that book with me, and that paper, and that piece of paper was preserved by being in the bank book." This exhibit is written in lead pencil, and contains two columns of figures, one of which appearently represents the entire cash on hand at the time of the fire. The total, as it appears thereon, is $10,752.50. The exact amount standing to Lay's credit in the bank at this time, as shown by his bank book, which is in evidence, is $10,969.35. The difference in the amounts is probably due to outstanding checks. The amount of cash on hand in the bank is now shown to be less than the sum actually received by Lay from the 1891 business during the time in question, for it stands admitted by him in the record that between January 1,

1892, and the date of the fire he received $11,878.15 from the sale of the surplus wheat, elevator rent, etc. The other column of the exhibit represents seven different items, which are deducted by Lay to produce the balance of $608.26 reported to Emery, and accepted by him as the balance due the farm at the date of the fire. The error in this balance of $608.26 to which we now allude is found in two items improperly deducted from the cash on hand. They are items shown upon the exhibit in the words and figures written by Mr. Lay as follows: "Superintendent's salary, $1,200." "Offset, Emery, $3,500." The first of these—the salary item—we find was improperly deducted, for Lay's salary as superintendent for 1891 had already been paid, and his salary for the year 1892 was subsequently paid from the proceeds of the crop of that year, as shown by his reports, which are in evidence. The second item, "Offset, Emery," evidently is a deduction for his benefit of the sum of $3,500 to equalize the division of profits from the 1891 crop, Mr. Emery having had that sum up to the date of the fire. In this we are convinced there was an error, and that $1,500 of this sum should not have been deducted. It is true that up to the time of the fire there had been a division of $3,500 profits to each, but only $2,000 each of this was out of the 1891 grain carried over. The other $1,500 to each had been divided prior to January 1, 1892, and was distributed to each out of the crop sold in 1891, as shown by Lay's reports. The plaintiff was accordingly entitled to retain out of farm funds for this period only an amount equal to that received by Emery, which was $2,000. This exhibit, which is vouched for as the basis upon which the balance was struck at Bradford by Mr. Lay, and is written by him, when considered in connection with his reports, does not seem to admit of any other interpretation than that we have given, and our examination of his evidence does not disclose any explanation of the deduction of these two items. Counsel suggests that these amounts represented Lay's salary for the preceding year, and his share of the profits received prior to January 1, 1892, which he might have carried in the bank, and had there at the date of the fire. This explanation would be satisfactory if it were borne out by the evidence, but not only is there no testimony that such portion of the money in the bank as belonged to him remained unused by him, but it does appear that during this very period he made cash payments in considerable amounts for farm lands and town lots; also that this bank fund was used generally by him in payment of private accounts, and for family expenses. As has been noticed, no account of the receipts and disbursements for the period between January 1, 1892, and October 17, 1892, was ever made by Mr. Lay other than such as occurred at Bradford. It has developed that he received $11,878.15. The only part of this he now accounts for so that it can be identified is the sum of $4,000, being $2,000 to Emery and a like amount to himself upon division of profits. The explanation in the evidence as to the balance is that it went to pay farm expenses, but no items of payment are attempted

to be pointed out. We are convinced that a portion of this sum unaccounted for is contained in the two errors pointed out, and that plaintiff has therefore had the use of $2,700 of undivided partnership funds since October 18, 1892, and must account therefor to the partnership, with 7 per cent. interest. The amount at this date, with interest, is $3,941.20. Inasmuch as this money represents the proceeds of wheat sold in a year when there was a surplus for division, each being entitled to a distributive share, the plaintiff is charged with only one-half of this sum, or, in exact figures, $1,970.60, which sum is here found against him.

Other delinquencies in the use of farm money are urged to have existed, and some of them are shown by the evidence. For instance, it appears that on January 15, 1892, the plaintiff had issued to himself, by the bank wherein the partnership funds were deposited commingled with his own, an interest-bearing certificate of deposit for $3,000; also another for the same sum on April 14, 1892; further, that on October 18, 1892,—the day after the house burned,—these were cashed, and the proceeds thereof, along with enough of the other moneys there on deposit to make $9,000, were invested by plaintiff personally in bank stock. For the use of these funds, or the profits made by their use, the plaintiff is undoubtedly liable to the partnership. The evidence, however, fails to show what profits were earned by the funds so diverted, and what the exact amounts were, and the length of time they were withheld from the partnership business. Under such conditions we are not able to fix a measure of relief upon a basis of the profits earned by the use of partnership funds.

It is also urged that plaintiff used a large amount of provisions taken from the farm to support his family in Grand Forks, such as butter, eggs, poultry, etc., and it is true some such property was taken, but in this it appears that plaintiff acted in good faith, and with the assent of Mr. Emery, for plaintiff informed him by letter that he was doing so, and explained that in return therefor he was keeping at his own expense the horse used to drive to and from the farm. Plaintiff is also charged with using defendant's teams and machinery, men, etc., to farm other lands for his sole benefit. The evidence shows that during the different years, to a varying extent, the men and farming outfit did work upon other lands in which the plaintiff was interested. This he explains by stating that such work was done when there was a surplus of horses and help, and to the farm's advantage, and that the farm was compensated with a share of the crops which they had assisted in producing, or by a return of work at other times. Here again we are unable to determine from the evidence the amount of profit plaintiff made by such use of partnership property.

One more point remains to be considered. It is contended that plaintiff did not devote his entire time to the partnership business,

and should not, therefore, be allowed to retain compensation fo·
such portion of the time as is shown to have been otherwise em--
ployed.  To this we agree.  It is apparent, from a consideration of
the large interests involved, and the further fact that the entire
property and its control and the management of the partnership
business were instrusted exclusively to him, that his agreement
to give the business of the partnership his entire time was the
controlling inducement which caused defendant to enter into the
contract.  A full performance was required, otherwise the partner-
ship would suffer; for, so far as an intelligent management of the
actual farming operations and a judicious control of the expenses
were important in making a success of their venture, they were
entirely in his hands.  It is in evidence that during the entire five
years the plaintiff was not at the farm on an average more than
one-half of the time, and this is not seriously controverted by him.
But it is his contention that he was there when necessary, and that,
when absent, he was engaged in looking after the partnership's fin-
ancial affairs.  If the evidence supported this, it is patent that there
would be no legal ground for making a deduction from his salary,
for it is apparent that plaintiff might have rendered valuable service
by employing his time elsewhere in securing advantageous bargains
in the purchase of supplies, and also favorable prices for the farm
produce, and in otherwise promoting its interests; for such services
without doubt would be relatively more important than the actual
management of the farming operations.  The evidence, however,
does not show that this was the case.  On the contrary, it discloses
not only that he did not interest himself in furthering the interests
of the partnership, but it shows affirmatively that he was generally
engaged about his own personal affairs, and in some instances with
the use of farm property and funds.  As an important instance of
plaintiff's failure to render the service required of him, we cite
his failure to keep the accounts of the partnership business pro-
vided for in the contract.  Our examination of the record before
us has placed beyond doubt that at no period did plaintiff keep a
record of the partnership affairs from which could be determined the
exact state of accounts.  No cash account was kept.  No record
of the items of receipts and disbursements, of the date of the trans-
actions.  No account was kept showing year by year the separate
amounts received or advanced by the separate partners.  Although
the receipts and disbursements extended into thousands of dollars
each year, no separate bank account was kept for the farm, and its
funds were mingled indiscriminately with his own private funds,
and without means of identification through any account kept by
him.  Plainly, such bookkeeping was not contemplated in the con-
tract.  But we are not to presume that it was expected that Mr. Lay,
who had just given up the practice of law, would bring to the keeping
of the accounts of the partnership the system of a skilled accountant,
and at the same time to the actual management of the farm the

judgment of an experienced farmer. While it appears that Mr. Emery had some knowledge of plaintiff's method of bookkeeping, and while he may have waived a right to object to it as unskillful, he may nevertheless ·insist that it be reasonably accurate, and truly represent the exact condition of affairs. It also appears that the moneys belonging to the partnership, as well as certain private money of Mr. Emery, were all deposited by him in the bank to his own credit, and portions thereof checked out by him in various amounts. Several instances are shown where he obtained rebates for his own personal benefit upon accounts paid by the partnership, and charged as expenses against it in the full amount. One of these is a store bill rendered by R. B. Griffith for merchandise furnished the farm, the amount of the rebate being $97.53. In another case a lumber bill of E. J. Myra, charged in full to the farm, contained items furnished to the plaintiff personally, amounting to $66.86. It also stands admitted that the threshing engine and feeder ·which were put in at the settlement on February 12, 1895, at $1,160, which was said to be cost price, in fact cost but $1,110. Reference has already been made to the $28 discount in the account of Mr. and Mrs. Miller. To this was coupled the further delinquency of reporting their wages as paid for three successive years, and settling with the defendant upon that basis, when in fact they had not been paid. These and several other items of a similar nature which have been disclosed were presented to the trial court in the form of a correction account, and were adjusted in its findings, so that they will not enter into the computation made in this Court. To what has already been stated it is needless to add more to show that plaintiff did not devote all of his time or render the services in connection with the management of the financial affairs of the partnership which the contract required, and that such failure was the direct cause of serious loss to Mr. Emery; further, that he entirely failed, both in letter and in spirit, to keep the correct account of its receipts and disbursements, which both good faith and his contract demanded. Failing in this, he is not entitled to recover for the value of such portion of his time as is shown not to have been employed in the partnership business.

Our duty in this regard is expressed in 1 Story, Eq. Jur. § 468, as follows: "Courts of equity adopt very enlarged views in regard to the rights and duties of agents, and in all cases where the duty of keeping regular accounts and vouchers is imposed upon them they will take care that the omission to do so shall not be used as a means of escaping responsibility or obtaining undue recompense. If, therefore, an agent does not, under such circumstances, keep regular accounts and vouchers, he will not be allowed the compensation which would otherwise belong to his agency" *White* v. *Lady Lincoln,* 8 Ves. 363: *Lupton* v. *White,* 15 Ves. 441. The right and duty of a court of equity to charge back to a managing partner the value of services not rendered by him is recognized in *Weeks* v. *McClintock* (Ark.) 6 S. W. Rep. 734; *Marsh's Appeal*

(Pa.) 8 Am. Rep. 206; *Leighton* v. *Hosmer,* 39 Ia. 594; *Red-
field* v. *Gleason,* 61 Vt. 220, 17 Atl. Rep. 1075. This principle ap-
peals to us as equitable and just. Upon this basis the plaintiff must
be charged with the sum of $4,000, being one-half of his salary
for five years. In making this reduction we disregard such com-
pensation as was received by plaintiff by way of profits, which
amounts to a considerable sum over the deficiencies advanced by
him, and is entirely favorable to him. The adjustment of the items
of surplus and underplus made by the trial court, including certain
other propety taken by defendant, meets with our approval, and the
total sum of $2,224.50 so found to be due the plaintiff therefor shall
stand. In conclusion we may say that the facts shown entitle the
defendant to a full accounting since January 1, 1890, at the hands
of the Court. But, on account of the doubtful character of the evi-
dence submitted for our consideration an accurate accounting is not
possible. We are limited, therefore, to charging back such items of
error as are satisfactorily shown. Outside of these items, the settle-
ment of the parties, though possibly replete with errors, must stand.
In so holding we do not permit ourselves to even hope that com-
plete justice has been done. But the fault lies at the door of the
parties themselves,—the plaintiff directly for producing this chaotic
condition of the accounts, the defendant for permitting it to con-
tinue after he knew the confusion in which they were enveloped.

Summarizing, we charge the plaintiff with the sum of $1,970.60,
being the amount of the error in the report of cash on hand on
October 18, 1892, with interest to date; further, with the sum
of $4,000, the sum determined by us as retined for services not
rendered,—making a total charge of $5,970.60. We credit him
with the amount found by the trial court, $2,224.50, leaving a bal-
ance due to the defendant from plaintiff of $3,746.10, for which
judgment is hereby given. The judgment of the District Court is
reversed, and that court is directed to enter a judgment in favor of
the defendant and against the plaintiff for the amount here adjudged
to be due. All concur.

### ON REHEARING.

In a petition for rehearing plaintiff urges that, inasmuch as this
is an adjustment between partners, he should not be charged with
the entire $4,000 which we have found he retained from farm funds
for services not rendered, his contention being that this sum should
be returned to the partnership; and that as a partner he is entitled
to one-half of it, or, in other words, as between Emery and himself
he should be charged with but half of the $4,000. This would be
true if the partnership had discharged all of its obligations, and
the sum so returned represented undivided profits. But such is not
the case. It appears that for the unadjusted year, 1894, no portion
of the $6,000 due Emery has been paid. It is apparent that there
can be no division of funds to the partners as such until this is paid,
and until that time the funds of the partnership must be applied to
discharging that obligation. Under this state of facts the $4,000

of partnership funds in Lay's hands is all due to Emery, and is properly charged to Lay. The deduction of the item of $1,970.60 for the error in the report of farm moneys in Lay's hands at the time of the fire was made after a most careful examination of all the evidence tending to throw light on that period. Further examination has not changed our views. It is admitted that at the date of the fire Lay had received $11,878.15 of partnership moneys since his last report. The computations made by Lay upon Exhibit 19 refer only to this period, and evidently were made with a view to show the balance of cash remaining in the bank belonging to the farm. Lay says: "This was intended to cover all of the matters of 1891 that had not been settled, and all of the affairs of 1892 up to the fire. It included the whole. That is what it had reference to." Taken as an explanation for this period, it is clear that the two items, viz: "Lay's salary" and "Offset, Emery," were improperly deducted. It is true, we have given this exhibit a weight and significance not attached to it by counsel for either party or by the trial court. It stands in record, however, as the only explanation offered by Lay as to the manner the balance of $608.25 was found. Should we reject it, as counsel for plaintiff suggests, as meaningless, then plaintiff would have to account in detail for the entire sum received by him during this period, for it is only through this attempted settlement that it can be contended that the defendant has waived his right to have an itemized account of the receipts and disbursements from January 1, 1892, to October 17, of the same year, which the evidence shows could have been made with tolerable accuracy. We think that it is our duty to give weight to this exhibit, which is offered as the only explanation for the balance struck at the date of the fire, and then correct the errors patent upon its face, rather than to utterly ignore it, and charge the plaintiff with all of the farm moneys shown to have been received by him during this period, and which are not otherwise accounted for or explained. We find, however, that in adopting the judgment of the District Court we carried into our judgment two errors contained in its adjustment. By the terms of the settlement of February 12, 1895, embodied in the written memorandum, the partnership wheat on hand was to be sold, and the deficiency for the year 1894 paid from it, and the balance was to belong to Emery. Here the terms of the settlement govern us. Lay has individually paid the deficiency for that year, amounting to $1,527.34. This he was entitled to have back from the sale of the wheat. The District Court gave him but half. He was also charged with one-half of the 1894 taxes. This was error. Viewed as a part of the farm expenses,—and the evidence shows that it was so considered in prior years,—it should have been paid from the sale of the wheat which Emery had taken possession of. These errors we correct by crediting the amount of these two items upon the judgment heretofore ordered. The judgment is thus reduced to $2,505.11, and, as so modified, will stand. The petition for rehearing is denied.

(79 N. W. Rep. 1053.)